## Sceva v. True.

The court will not, generally, consider questions of law raised by an agreed statement of facts, unless it appear that some practical result in the case will follow their decision.

The idea of a contract implied by law is a legal fiction, invented and used, for the sake of the remedy, to enforce the performance of a legal duty.

The difference between this fiction and a true or actual contract considered.

For the purpose of raising questions of law, and no other, the parties agreed that the facts are as stated in the following motions to dismiss, and the questions were reserved for the consideration of the whole court.

The defendant, by her guardian *ad litem*, moves to quash the writ in this suit, and to dismiss said suit, (1) because, at the time of the attachment of the defendant's real estate in the town of Andover in said suit—as appears by the officer's return upon said writ—and at the time of the service of said writ, and for more than forty years prior thereto, she was, and had been, insane, and without any guardian, and was, and for more than a quarter of a century had been, so hopelessly insane as to have no reason or understanding; that at the time of such attachment and service—and since about November 1, 1871—she was, and has been, kept at a private mad-house in said town, by its overseers of the poor, as one of its insane poor; that the service of said writ was made and completed by leaving a writ of summons therein, at said mad-house; that, for nearly the entire forty years prior to said November 1, 1871, she had lived under the same roof with plain-

tiff's intestate, who was her brother-in-law, and under his charge, and that all the facts which transpired prior to the death of said intestate (about June 1, 1872) were well known to him, and that the plaintiff had notice or knowledge of all the facts in the premises. (2) That this suit is assumpsit for the support of said Fanny, under the circumstances before set forth, and those which follow. Prior to his death, August 11, 1822, William True, father of said Fanny and her sister Martha, wife of said intestate, owned a farm in Andover and Hill, with a house, barn, and out-buildings thereon, situate in said Andover. On May 25, 1822, in expectation of his death, said William True made the following disposition of his property : He gave, by an instrument in writing under seal, all his personal property, upon certain conditions and subject to certain charges, to his widow, Betsey True, who died upon said premises in May, 1844, without re-marrying. He also gave her on the same day, in the same way, " the use and occupation of said real estate, both of lands, buildings, and tenements, so long as she, the said Betsey, remains my widow." He also, by deed, conveyed on the same day one undivided half of all said real estate to each of said daughters. Said intestate carried on said premises in 1822, and married said Martha in December, 1823, and lived on said premises till about one month before his death. All the parties, save Fanny, treated said deeds and instruments as valid, and supposed they were valid ; and, aside from the time that the said defendant was away in insane asylums and infirmaries for treatment, all lived together on said premises in one family till they died, or until said Enoch F. Sceva refused to support said Fanny longer ; and she was taken away about said November 1, and when said Enoch F. Sceva left, the month prior to his death. Said Sceva took the entire charge of the premises, used the crops and the proceeds of the lumber, wood, and bark, sold off of the whole farm for the common benefit of the family, and paid the taxes and other bills for the support and maintenance of the family. No administration was ever had upon any part of the estate of said William True, nor was there any use or trust for the benefit of said Fanny. No attempt was ever made to make any contract with said Fanny about her support, or anything else. No application was made for the appointment of a guardian in the interest of said Enoch F. Sceva, because of the opposition of his wife to any step looking to that end. She has been supported during said forty years by said Sceva, his wife, and her mother, out of the avails of said real estate taken as aforesaid, and out of their own funds. Since 1844 her chief support has been from said Sceva. Said intestate was worth nothing when he commenced on said farm, and died worth about $1600.

*Shirley*, for the defendant.

The foundation principle of the entire law of contracts is, that the parties must have the capacity to contract, and must actually exercise their faculties by contracting. Here there was *no* capacity, for there

was but *one* mind ; no contract was made, and *no attempt* was made t
make one.  The two vital facts, without which no contract, tacit o
express, can exist—capacity and its exercise—are wanting.  Was ther
an implied contract ?  What does that term mean ?  In thousands o
cases, in the books, we know just what it means.  The parties have
capacity to contract; facts, circumstances, few or many, clear or com-
plicated, exist, which lead the minds of the jurors to the conclusion
that the minds of the parties met.  Minds may meet by words, acts
or both.  The words even may negative such meeting, but " acts which
speak louder than words " may conclude him who denies a tacit con-
tract.  Aside from cases where the capacity to contract is wanting, no
instance now occurs to us in which the implied contract cannot be
supported upon these principles, and the familiar doctrines of waiver
and estoppel.  Our position is, that where there is no express contract,
a jury may from circumstances infer one, but that this can in no case
be done where the capacity to contract is wanting.  This court has
settled that there is a distinction between the cases of minors and
lunatics.  *Burke* v. *Allen*, 29 N. H. 117.  The reasons are apparent.
It is another fundamental principle, that no one, by voluntarily per-
forming services for another, can make that other his debtor.  If these
principles apply to cases where the contracting mind is wanting, they
settle this case.  We know it is sometimes said, in such a case, " the
law will imply a contract."  What does that mean ?  As it seems to
us, only this : that where A, who has capacity to contract, furnishes B,
who is totally destitute of such capacity, what is proper for B to have,
the judges will turn the bench into a brokers' board, will substitute
themselves for B, make a contract where none existed, cause it to relate
back to the voluntary acts of A, and then sit in judgment upon and
enforce their own contract.  It is a perversion of language to call such
a performance a contract of any kind.  It is judicial usurpation.  The
constitution gave the court no such power.  The court has no power
to make contracts for people : it can only infer one where a jury might.
Upon this point he also cited and commented on *McCrillis* v. *Bartlett*,
8 N. H. 569 ; *La Rue* v. *Gilkyson*, Ex'rs, 4 Pa. St. 375 ; *Richardson* v.
*Strong*, 13 Iredel 107, 108 ; *Fitzgerald* v. *Reed*, 9 S. & M. 94 ; *Ballard*
v. *McKenna*, 4 Rich. Eq. 358; *Combs* v. *Beatty*, 3 Bush. 613 ; *Sawyer*
v. *Lufkin*, 56 Me. 308 ; *Gore* v. *Gibson*, 13 M. & W. 623 ; *Baxter* v.
*Portsmouth*, 2 C. & P. 178 ; *Brown* v. *Jodrell*, 3 C. & P. 30 ; *Hallett* v.
*Oakes*, 1 Cush. 296.  To other points in the case considered by the
court, he cited *Munger* v. *Munger*, 33 N. H. 582 ; *Concord* v. *Rumney*,
45 N. H. 429; *Seavey* v. *Seavey*, 37 N. H. 133 ; *Bundy* v. *Hyde*, 50
N. H. 123.

*Barnard*, for the plaintiff, cited Story on Con., secs. 12, 42 ; *Ogden*
v. *Saunders*, 12 Wheat. 341 ; 2 Bl. Con. 443 ; Par. on Con. (4th ed.)
375 ; Chitty on Con. 140 ; *Hallett* v. *Oakes*, 1 Cush. 295 ; *Seaver* v.
*Phelps*, 11 Pick. 304; *Baxter* v. *Portsmouth*, 5 B. & C. 170 ; S. C.,
7 D. & R. 614, and 2 C. & P. 178 ; Phillips on Lunacy 17 ; 5 Beav.

29 ; 2 Ct. & Fin. 662 ; 4 Barr. 375 ; 12 Barb. 237 ; *Kendall* v. *May*, 0 Allen 59 ; Met. on Con. 78, 79 ; *McCrillis* v. *Bartlett*, 8 N. H. 571, and most of the other cases commented on by Mr. Shirley.

LADD, J. It is obvious, we think, that one question which has been argued by counsel at considerable length, namely, whether legal service of a writ can be made upon an insane person or idiot, is not before the court, on this motion to dismiss, in such way that any practical results would be gained by deciding it. The agreement of the parties is not that the suit shall be dismissed in case the court are of opinion that the service was insufficient, but only that the facts may be taken to be as stated for no other purpose but to present the question to the court ; and, if the decision should be adverse to the plaintiff, we see no reason why he is not still in a position to take the objection that the matter ought to have been pleaded in abatement in order that an issue may be raised for trial by jury upon the facts which he reserves the right to contest. For this reason we have not considered that question.

The other facts stated in the motion (which is to be regarded rather as an agreed case than a motion to dismiss) stand upon a different footing, inasmuch as they go to the merits of the case, and may be pleaded in bar or given in evidence under the general issue, and, when so pleaded or proved, their legal effect will be a matter upon which the court, at the trial, must pass. Some suggestions upon this part of the case may therefore be of use.

We regard it as well settled by the cases referred to in the briefs of counsel, many of which have been commented on at length by Mr. Shirley for the defendant, that an insane person, an idiot, or a person utterly bereft of all sense and reason by the sudden stroke of accident or disease, may be held liable, in assumpsit, for necessaries furnished to him in good faith while in that unfortunate and helpless condition. And the reasons upon which this rests are too broad, as well as too sensible and humane, to be overborne by any deductions which a refined logic may make from the circumstance that in such cases there can be no contract or promise in fact,—no meeting of the minds of the parties. The cases put it on the ground of an implied contract ; and by this is not meant, as the defendant's counsel seems to suppose, an actual contract,—that is, an actual meeting of the minds of the parties, an actual, mutual understanding, to be inferred from language, acts, and circumstances, by the jury,—but a contract and promise, said to be implied by the law, where, in point of fact, there was no contract, no mutual understanding, and so no promise. The defendant's counsel says it is usurpation for the court to hold, as matter of law, that there is a contract and a promise, when all the evidence in the case shows that there was not a contract, nor the semblance of one. It is doubtless a legal fiction, invented and used for the sake of the remedy. If it was originally usurpation, certainly it has now become very inveterate, and firmly fixed in the body of the law.

Suppose a man steals my horse, and afterwards sells it for cash : the law says I may waive the tort, and recover the money received for the animal of him in an action of assumpsit. Why? Because the law, in order to protect my legal right to have the money, and enforce against the thief his legal duty to hand it over to me, implies a promise, that is, feigns a promise when there is none, to support the assumpsit. In order to recover, I have only to show that the defendant, without right, sold my horse for cash, which he still retains. Where are the circumstances, the language or conduct of the parties from which a meeting of their minds is to be inferred, or implied, or imagined, or in any way found by the jury? The defendant never had any other purpose but to get the money for the horse and make off with it. The owner of the horse had no intention to sell it, never assented to the sale, and only seeks to recover the money obtained for it to save himself from total loss. The defendant, in such a case, may have the physical capacity to promise to pay over to the owner the money which he means to steal; but the mental and moral capacity is wanting, and to all practical intents the capacity to promise according to his duty may be said to be as entirely wanting as in the case of an idiot or lunatic. At all events, he does not do it. He struggles to get away with the money, and resists with a determination never to pay if he can help it. Yet the law implies, and against his utmost resistance forces into his mouth, a promise to pay. So, where a brutal husband, without cause or provocation, but from wanton cruelty or caprice, drives his wife from his house, with no means of subsistence, and warns the tradesmen not to trust her on his account, thus expressly revoking all authority she may be supposed to have, as his agent, by virtue of the marital relation, courts of high authority have held that a promise to pay for necessaries furnished her while in this situation, in good faith, is implied by law against the husband, resting upon and arising out of his legal obligation to furnish her support. See remark of SARGENT in *Ray* v. *Alden*, 50 N. H. 83, and authorities cited. So, it was held that the law will imply a promise to pay toll for passing upon a turnpike road, notwithstanding the defendant, at the time of passing, denied his liability and refused payment. *Proprietors of Turnpike* v. *Taylor*, 6 N. H. 499. In the recent English case of *The Great Northern Railw. Co.* v. *Swaffield*, L. R., 6 Exch. 132, the defendant sent a horse by the plaintiffs' railway directed to himself at S. station. On the arrival of the horse at S. station, at night, there was no one to meet it, and the plaintiffs, having no accommodation at the station, sent the horse to a livery stable. The defendant's servant soon after arrived and demanded the horse: he was referred to the livery stable keeper, who refused to deliver the horse except on payment of charges which were admitted to be reasonable. On the next day the defendant came and demanded the horse, and the station-master offered to pay the charges and let the defendant take away the horse; but the defendant declined, and went away without the horse, which remained at the livery stable. The plaintiffs afterwards offered to deliver the horse to the defendant

at S. without payment of any charges, but the defendant refused to receive it unless delivered at his farm, and with payment of a sum of money for his expenses and loss of time.   Some months after, the plaintiffs paid the livery stable keeper his charges, and sent the horse to the defendant, who received it; and it was held that the defendant was liable, upon the ground of a contract implied by law, to the plaintiffs for the livery charges thus paid by them.

Illustrations might be multiplied, but enough has been said to show that when a contract or promise implied by law is spoken of, a very different thing is meant from a contract in fact, whether express or tacit.   The evidence of an actual contract is generally to be found either in some writing made by the parties, or in verbal communications which passed between them, or in their acts and conduct considered in the light of the circumstances of each particular case.   A contract implied by law, on the contrary, rests upon no evidence.   It has no actual existence ; it is simply a mythical creation of the law. The law says it shall be taken that there was a promise, when, in point of fact, there was none.   Of course this is not good logic, for the obvious and sufficient reason that it is not true.   It is a legal fiction, resting wholly for its support on a plain legal obligation, and a plain legal right.   If it were true, it would not be a fiction.   There is a class of legal rights, with their correlative legal duties, analogous to the *obligationes quasi ex contractu* of the civil law, which seem to lie in the region between contracts on the one hand, and torts on the other, and to call for the application of a remedy not strictly furnished either by actions *ex contractu*, or actions *ex delicto*.   The common law supplies no action of *duty*, as it does of assumpsit and trespass ; and hence the somewhat awkward contrivance of this fiction to apply the remedy of assumpsit where there is no true contract, and no promise to support it.

All confusion in this matter might be avoided, as it seems to me, by a suitable discrimination in the use of the term implied contract.   In the discussion of any subject, there is always danger of spending breath and strength about mere words, as well as of falling into error when the same term is used to designate two different things.   If the term, implied contract, be used indifferently to denote (1) the fictitious creation of the law spoken of above ; (2) a true or actual but *tacit* contract, that is, one where a meeting of the minds or mutual understanding is inferred as matter of fact from circumstances, no words written or verbal having been used ; and (3) that state of things where one is estopped by his conduct to deny a contract, although, in fact, he has not made or intended to make one,—it is not strange that confusion should result, and disputes arise where there is no difference of opinion as to the substance of the matter in controversy : whereas, were a different term applied to each, as, for example, that of legal duty to designate the first, contract, simply, to designate the second, and, contract by estoppel, the third, this difficulty would be avoided.   It would of course come to the same thing, in substance, if the first were always

called an implied contract, while the other two were otherwise designated in such way as to show distinctly what is meant. This is not always done, and an examination of our own cases would perhaps show that more or less confusion has arisen from such indiscriminate use of the term. A better nomenclature is desirable. But whatever terms are employed, it is indispensable that the distinction, which is one of substance, should be kept clearly in mind, in order that the principles governing in one class of cases may not be erroneously applied to another. See remarks of SMITH, J., in *Bixby* v. *Moore*, 51 N. H. 402, and authorities cited at page 404.

Much may doubtless be said against supplying a remedy for the enforcement of a plain legal right " by so rude a device as a legal fiction"—Maine's Ancient Law 26; but, at this time of day, that is a matter for the consideration of the legislature rather than the courts. The remedy of *indebitatus assumpsit* can hardly be abolished in that large class of cases where it can only be sustained by resorting to a fiction until some other is furnished to take its place.

It by no means follows that this plaintiff is entitled to recover. In the first place, it must appear that the necessaries furnished to the defendant were furnished in good faith, and with no purpose to take advantage of her unfortunate situation. And upon this question, the great length of time which was allowed to pass without procuring the appointment of a guardian for her is a fact to which the jury would undoubtedly attach much weight. Its significance and importance must, of course, depend very much on the circumstances under which the delay and omission occurred, all of which will be for the jury to consider upon the question whether everything was done in good faith towards the defendant, and with an expectation on the part of the plaintiff's intestate that he was to be paid. Again : the jury are to consider whether the support for which the plaintiff now seeks to recover was not furnished as a gratuity, with no expectation or intention that it should be paid for, except so far as compensation might be derived from the use of the defendant's share of the farm. And, upon this point, the relationship existing between the parties, the length of time the defendant was there in the family without any move on the part of Enoch F. Sceva to charge her or her estate, the absence (if such is the fact) of an account kept by him wherein she was charged with her support, and credited for the use and occupation of the land,—in short, all the facts and circumstances of her residence with the family that tend to show the intention or expectation of Enoch F. Sceva with respect to being paid for her support, are for the jury. *Munger* v. *Munger*, 33 N. H. 581; *Seavey* v. *Seavey*, 37 N. H. 125 ; *Bundy* v. *Hyde*, 50 N. H. 116. If these services were rendered, and this support furnished, with no expectation on the part of Enoch F. Sceva that he was to charge or be paid therefor, this suit cannot be maintained ; for then it must be regarded substantially in the light of a gift actually accepted and appropriated by the defendant, without reference to her capacity to make a contract, or even to signify her acceptance by any mental assent.

In this view, the facts stated in the case will be evidence for the jury to consider upon the trial; but they do not present any question of law upon which the rights of the parties can be determined by the court.

*Case discharged.*