**FIRST NAT. BANK of OKMULGEE v. MATLOCK et al.**

No. 13929—Filed Feb. 26, 1924.

Rehearing Denied May 13, 1924.

1. **Contracts — Quasi or Constructive Contracts—Liability of Mortgages for Operating Expenses of Oil Property.**

Contracts implied in law, or more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, and where a mortgagee, under agreement with an insolvent mortgagor, receives all of the revenues derived, or production from an oil and gas mining lease, covered by his mortgage, pending foreclosure proceedings, the mortgagee becomes liable for the labor, and for all necessary expenses incurred by reason of the continued operation of the lease, for his benefit.

2. **Contracts—Quasi Contracts—Basis.**

In quasi contracts the obligation arises, not from consent of the parties, as in the case of contracts express or implied in fact, but from the law of natural, immutable justice and equity.

3. **Same—Implied Contract Distinguished.**

A quasi or constructive contract is an implication of law. An implied contract is an implication of fact. In the former the contract is a mere fiction imposed in order to adapt the case to a given remedy. In the latter the contract is a fact legitimately inferred. In one the intention is disregarded; in the other it is ascertained and enforced. In one the duty defines the contract; in the other the contract defines the duty.

(Syllabus by Jones, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Okmulgee County; John L. Norman, Judge.

Action by W. L. Matlock and others against the First National Bank of Okmulgee. Judgment for plaintiffs, and defendant appeals. Reversed and remanded.

Cochran & Ellison, for plaintiff in error.

H. S. Samples and Beckett & Lewis, for defendants in error.

Opinion by JONES, C. This suit was instituted by the appellees, plaintiffs below, in May, 1921, in the district court of Okmulgee county. Originally separate suits were instituted by each of the parties appearing here as appellees, against appellant, First National Bank of Okmulgee, and the Bankers Oil Company for the purpose of recovering certain wages due plaintiffs for the operation of certain producing oil leases and a gasoline plant which the various plaintiffs operated in different capacities; by order of the court, all of the suits were consolidated in one cause No. 8252. There was pending foreclosure proceedings involving said properties, known as the Graham and Sutton leases, wherein the appellant, First National Bank of Okmulgee, was the plaintiff and the Bankers Oil Company defendant, which suit was instituted sometime prior to the institution of this suit. And on

the 15th day of February, 1921, judgment was rendered in said cause foreclosing the mortgage and declaring a lien upon the Graham lease, in the amount of $37,471.60 and attorneys fee, and upon the Sutton lease in the sum of $10,500, cost and attorneys fee. And thereafter under said foreclosure proceedings the Graham lease was sold for $14,050, and the Sutton lease was sold for $10,000, leaving a deficiency judgment due the plaintiff in that case, First National Bank of Okmulgee, for more than $17,000. The appellees herein, plaintiffs in the lower court, allege in their petitions that the Bankers Oil Company and the First National Bank of Okmulgee were indebted to the various plaintiffs for labor and services rendered in the operation of said leases; they also attach certified copies of labor lien claims filed by each of the plaintiffs against the property of the Bankers Oil Company upon which the First National Bank had foreclosed its mortgage, and they pray judgment for various sums alleged to be the amounts due for labor, and ask that the court declare a lien upon the properties 'to secure the payment of the various amounts, for which they pray judgment. The appellee W. L. Matlock was superintendent and general manager of said oil properties, and had been in the employ of the Bankers Oil Company for the past three years prior to the institution of this suit, and as such superintendent his duties were to hire men and keep up the leases, and the production therefrom. James Devitt and Ed Glass were pumpers and Omer L. Devers and J. D. Carter each worked part of the time as pumpers, and part of the time run tower on the gasoline plant. Floyd Fisher acted as pumper. Henry Young and Charley Fields were laborers at the gasoline plant. Jess Sutton was a teamster and as such performed certain labors required of him about the leasehold, and M. N. Fair was employed to clean out one of the oil wells by the superintendent, Matlock. The case was tried to the court on the 14th day of April, 1922 and judgment rendered by the court as follows:

"That the defendant, Bankers Oil Company, is indebted to the plaintiffs and interveners herein, in the amount alleged in their petitions and intervening petitions herein filed and finds that the defendant, First National Bank of Okmulgee, Oklahoma, made no express contract for the payment of the claims sued upon and set out in the petitions and cross-petitions of the various claimants herein, but is liable to said plaintiffs and intervening claimants, on an implied promise to pay in the amounts hereinafter set out, on account of the fact that said defendant, First National Bank, received the proceeds of the oil produced from said prop-

erty. That the labor performed by plaintiffs and interveners in operating said property was performed with the knowledge and consent of the defendant, First National Bank, and said defendant recieved the benefit of such labor, and the court further finds that said plaintiffs and interveners have no lien upon said premises."

Personal judgments were rendered in favor of the various claimants against the appellants in the following amounts:

| | |
|---|---|
| W. L. Matlock | $600.00 |
| A. R. Swanson | 224.51 |
| E. D. Glass | 649.90 |
| J. D. Carter | 258.34 |
| Omer L. Devers | 358.67 |
| Floyd Fisher | 117.97 |
| M. N. Fair | 100.56 |
| Charley Fields | 161.86 |
| James McDevitt | 243.80 |
| Henry Young | 325.51 |
| Jess Sutton | 341.05 |

—from which judgment the First National Bank appealed and filed various assignments of error, and the principal error urged is that the court was in error in finding that there were facts sufficient upon which to base an implied contract. The court found that the First National Bank made no express contract for the payment of the claims sued upon, but that it is liable to plaintiffs on an implied agreement to pay the amounts above set out, on account of the fact that said defendant, First National Bank, received the proceeds from the oil produced from said properties. The court further found that the plaintiffs have no lien upon said properties. The plaintiffs took no exception or cross-appeal from the judgment of the court finding against them in the above particulars, and the matter is here for consideration solely on the appeal of the appellant from the judgment of the court wherein the court held it to be personally liable by reason of an implied contract.

The facts in this case which led up to the controversy show that subsequent to the filing of the foreclosure proceedings heretofore referred to by the First National Bank of Okmulgee against the Bankers Oil Company and during the pendency of same a receiver was applied for by the plaintiff in that case, appellant here, to take charge of the oil properties and to operate same. On the day upon which this matter was set for hearing the parties litigant reached an agreement whereby it was agreed that in lieu of the appointment of a receiver, the Bankers Oil Company, defendant, would turn over all the oil runs which constitute the revenues derived from the oil properties to the plaintiff bank, except that the first $500 received

each month from the oil runs should be used to pay the operating expenses of the properties. This agreement was entered into on the 18th day of October, 1920, and at which time the superintendent of the Bankers Oil Company, Matlock, one of the appellees herein, was present and had knowledge of the agreement under which he, together with the other employes, appellees herein, continued to operate the oil properties. On January 15, 1921, thereafter, the First National Bank and the Bankers Oil Company entered into a new and different agreement or stipulation which is as follows:

"It is agreed by the First National Bank that it will give the Bankers Oil Company credit for all monies collected by it under the prior agreement between them, less the monies returned to it for operating expenses and that the said bank and its attorneys shall not be under any further obligation to pay the sum of $500 per month for operating expenses to the Bankers Oil Company or its attorneys, but shall be entitled to retain all monies received by it and apply the same on the indebtedness without reduction."

This agreement was signed by Cochran and Ellison and W. E. Wells, attorneys for plaintiff and defendants respectively.

From the date of the first stipulation or agreement until the second one was entered into, the First National Bank had paid the oil company or its agents the $500 per month due under the terms of the original agreement, and the oil company seems to have still retained charge and control of the property and was paying the employe, at least the employe looked to them for pay. It seems that about April 1, 1921, there arose considerable controversy between the employes and the bank concerning their pay, and it developed that they had received no pay for their services in some instances since November, 1920. Some of the checks received by them from the oil company for their December pay had been protested and they had received no money since that time. The appellant bank on or about April 1st, agreed to pay for certain services to be rendered in the operation of the properties, but denies that it was under any obligation to pay for labor performed prior to that time. Some controversy arose as to whether or not it was worth while to continue the operation of the gasoline plant on the lease, and while the court makes no specific finding on this question the weight of the evidence clearly seems to be in favor of the contention of the appellant, First National Bank, to the effect that it ordered same discontinued and stated that it would pay for no labor or services rendered in the operation of same, and at about this time the bank

gave Matlock, the superintendent, a check for $175, and also delivered him a check for Glass for $75, and a check to Young for $125. Glass was one of the men who was in charge of the gasoline plant and this payment was made in satisfaction of his services from April 1st to 15th, at which time he quit the service of the company and did no further work on the premises, a fact which corroborates the position of the bank in that they had advised that the gasoline plant be closed, and the bank contends that the other payments made to Matlock and Young were for their salaries for the month of April, and while the said Matlock and Young seem to have given credit for services rendered long prior thereto, there is no specific denial by them of the contention made by the bank that these payments were for the month of April; and the controversy here involves the question of the right of the employes to hold the bank liable for their services rendered since the execution of the original agreement heretofore referred to of the 18th day of October, 1920. We think it is evident that the bank under the agreement entered into with Bankers Oil Company, of which agreement the superintendent, Matlock, had full knowledge, is protected from any liability for the expenses of the operation of the oil properties so long as that agreement was in full force and effect, which was, according to the record, the 15th day of January, 1921. From which date we are inclined to the opinion, in view of the contract which was entered into at that time, by the bank and the oil company, whereby the bank was to receive all the revenues derived from the oil properties, that the bank would be liable for the operating expenses from that time on.

Appellant cites Page on Contracts, and call special attention to paragraphs 1434 and 1436, and also the case of Morse v. Kinney (Vt.) 89 Atl. 865, which authorities discuss the conditions under which an implied contract may be inferred, and base it on the same grounds of an express contract, that of intention of the parties; in an express contract the parties arrive at their agreement by words either oral or written, and either under seal or not under seal: while in implied contracts the intent or agreement is deduced from the acts, words, and conduct of the parties, and call attention to the fact that an implied contract cannot be inferred contrary to the express understanding and intent of the parties. And call attention to the language in the case of Morse v. Kinney, supra, wherein the court held that the defendant could not be held liable as on an implied contract for feed

and keep of a horse in plaintiff's stable, which he claimed belonged to defendant, where defendant expressly told plaintiff that he did not own the horse, and would not be responsible for its keep, and further states a true implied contract depends upon the intention of the parties the same as an express contract, so that defendant's assent thereto is necessary. Unless a party benefited by the services of another has conducted himself so that his assent to pay for such service may be fairly inferred, he is not bound to pay therefor as having contracted for them.

We recognize this as a correct and just principle of law, but it is not applicable to the facts with which we are now confronted.

In the above quotation from the Morse Case, defendant having expressly told the plaintiff that the horse which he was keeping was not his (the defendant's) horse, clearly brought him within the rule announced, but had the defendant called for the horse and claimed it as his own or as being in his charge and under his dominion, then an entirely different state of facts would have existed, and a different rule of law would be applicable, and under such state of facts he would have been liable for the necessary feed and keep of his own horse, under ordinary circumstances, and under the general rule. And we think the appellant in this case is more in the attitude of claiming the horse than of denying ownership; they had an equitable interest in the property involved by reason of their mortgage which they foreclosed, and they were receiving revenues and benefits derived by reason of the labors of the plaintiffs, appellees herein. Further quoting from the case of Morse v. Kinney, the appellant calls attention to the following observation:

"The plaintiff cannot be held liable on an implied contract to pay for that which he expressly declines to have done on his account, unless the law imposes upon him an obligation to do something which he declines to do, and which must be done to meet the legal requirements. There is no such obligation upon one to retain and preserve his property whether it be live animals or anything else. He may abandon or destroy it, if he pleases. (Keith v. De Bussigney et al., 179 Mass. 255, 60 N. E. 614)."

And further states that his right to abandon or destroy live animals, is "subject of course to prohibitions of the statutes against cruelty to animals."

We cannot agree that this rule is applicable to the case at bar. The appellant, Bank of Okmulgee, was not in such position as would authorize them to abandon or destroy this property, their interest in same was by reason of their mortgage and they owed a duty to the mortgagors to preserve the property and to maintain the production thereof and apply same to the indebtedness. They cannot abandon or destroy the same unless they should first abandon and release the mortgagors from the indebtedness. If this should have been done and the property delivered to them in settlement of the debt, they then, of course, might have done as they pleased with the property.

Appellant cites numerous authorities in support of its contention that no facts were proved or exist in this case that would justify the findings of the court to the effect that there was an implied contract, and while we have no controversy with appellant as to the rules announced in the numerous authorities cited, like those which we have discussed, they are not applicable to the facts as they exist in this case.

Appellees in support of their contention and in support of the judgment of the court's finding that there was an implied contract, cite section 5031, Comp. Stat. 1921, defining an implied contract as follows:

"An implied contract is one, the existence and terms of which are manifested by conduct."

And cite the case of Mendonca v. Russell, 50 Okla. 376, 150 Pac. 1061, wherein the court said:

"And while the evidence of plaintiff did not show that he was by specific words or express contract a member of the firm, yet we think the conduct of the defendants at least showed an implied contract to that effect."

And further cite the case of Rains et al. v. Weiler et al., 166 Pac. 235, wherein the Supreme Court of Kansas said:

"Parties may be as firmly bound by implied contracts as by those expressed in formal language. In some cases parties arrive at agreements by words, either oral or written; and in other cases they arrive at an agreement by acts and conduct showing a mutual intention to contract, and from which the law implies a contract."

And also cite 13 C. J., p. 243 and 244, sec. 10, wherein the author discussed the question of implied contracts and distinguishes between contracts implied from facts, and contracts implied in law:

"Contracts implied in law, or more properly quasi or constructive contracts, are a class of obligations which are imposed or created by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice and which are allowed to be enforced by

an action, ex contractu. They rest solely on a legal fiction, and are not contract obligations at all in the true sense, for there is no agreement; but they are clothed with the semblance of contract for the purpose of the remedy, and the obligation arises not from consent, as in the case of true contracts, but from the law or natural equity. So, where the party to be bound is under a legal obligation to perform the duty from which his promise is inferred, the law may infer a promise even as against his intention"

—citing numerous authorities in support of this rule. We find the same rule announced in 6 R. C. L., p. 588, art. 7, under the head of quasi contracts, or contracts implied in law, and also in 2 R. C. L., p. 749, art. 8, wherein the author discusses the nature and character of quasi contracts and lays down the following rule:

"In quasi contracts the obligation arises, not from consent, as in the case of contracts, but from the law of natural equity"

—and distinguishes between express and implied contracts, implied in fact and obligations created and implied by reason of the law and equity. In the case of Shaffer v. Miller (Mont.) 109 Pac. 970, we find a discussion of the different character of contracts and in the body of the opinion. we find this language, on p. 972:

"In treating of quasi contracts or contracts implied by law, as distinguished from contracts implied in fact, the Supreme Court of Pennsylvania in Hertzog v. Hertzog, 29 Pa. 465, a leading case upon the subject, says: 'In one case the contract is a mere fiction, a form imposed in order to adapt the case to a given remedy; in the other, it is a fact legitimately inferred. In one the intention is disregarded; in the other it is ascertained and enforced. In one the duty defines the contract; in the other, the contract defines the duty. We have, therefore, in law three classes of relations, called contracts: (1) Constructive contracts, which are fictions of law adapted to enforce legal duties by actions on contract, where no proper contract exists, express or implied. (2) Implied contracts, which arise under the circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract. (3) Express contracts."

There is no question as to the fact that the defendants in error had a contract of employment with the Bankers Oil Company to operate the leases prior to October 18, 1920, when the application for receivership was made, and the parties reached an agreement whereby the properties would be operated, and revenues derived therefrom turned over to the bank, and we think under the facts as developed it more nearly comes within the rule of quasi, or construction contracts or contracts implied in law. Had appellant, the First National Bank, pressed its application for appointment of receiver no doubt the receiver would have been appointed, as it is evident from all the facts disclosed that the Bankers Oil Company, mortgagors, were insolvent, and unable to meet its obligations, and as further disclosed by the record the securities of the appellant, First National Bank, were inadequate. Had a receiver been appointed, we take it no question would have arisen as to the liability of the prevailing party in the suit, and the monies derived from the oil runs, the revenues produced from the subject matter of the suit, and over which the receiver would have been placed in charge, would have been liable for the expenditures of receivership which would have included all the legitimate expenditures and wages of employes necessary to operate the oil properties, and from this viewpoint it would seem that the bank should be liable for the just expenditures in view of the fact that the agreement was entered into by the parties in lieu of the receivership, and evidently the bank recognized this rule by agreeing that $500 might be deducted each month to pay operating expenses.

This brings us to the question of whether or not the judgment is correct in the amounts rendered. We think from the facts as disclosed by the record that under the agreement of October 18, 1920, of which Matlock, the superintendent of the property, had knowledge and seems to have advised the other appellees of the effect of same, that under that contract the employe must necessarily look to their original employer, the Bankers Oil Company, but from and after January 15, 1921, at which time the original contract was abrogated, or set aside, and a new agreement was entered into whereby the appellant bank was to receive and did receive all of the revenues and profits derived from the oil properties and with full knowledge of the necessity of continuing operations of the oil properties in order that revenues might be produced for their benefit, we think sufficient to constitute a contract implied by law that they should pay the necessary expenses incurred by the employment of labor necessary to properly operate said oil properties. However, they would not be liable for the services of employes serving contrary to their wishes and over their express objections.

This seems to be true to some extent of the services of those appellees who were employed to operate the gasoline plant, but the evidence is not clear as to just when

this objection to the operation of the gasoline plant was made by the appellants, and made known to the employes and likewise the evidence as disclosed by the record is not clear as to just what amount the various appellees would be entitled to receive or recover under this opinion, having held that the appellant bank is only personally liable for the services rendered subsequent to January 15, 1921, and up until the institution of the suits for labor by the various appellees and for that reason, we find it necessary to reverse the case and remand same for a new trial, in conformity to this opinion.

By the Court: It is so ordered.