Tammy **BOOKER**, now Loar, Adminis-tratrix of the Estate of William O. Booker, Deceased, Appellant,

v.

**SEARS ROEBUCK & COMPANY**, Kiami-chi Valley LP Gas Co., J.D. Fite, d/b/a Clayton Propane, Inc., Appellants,

and

**Kerr–McGee Refining Corporation, Appellee.**

No. 69685.

Supreme Court of Oklahoma.

Dec. 5, 1989.

As Corrected Dec. 7, and Dec. 12, 1989.

Rehearing Denied Jan. 30, 1990.

Williams, Clark, Baker & Earl, P.A. by Joseph F. Clark, Jr., Tulsa, for appellants,

Kiamichi Valley LP Gas Co. and J.D. Fite d/b/a Clayton Propane, Inc.

Pierce Couch Hendrickson Johnston & Baysinger by Calvin W. Hendrickson, D. Lynn Babb, and S. Marc Walls, Oklahoma City, for appellee.

HODGES, Justice.

The appeal before us is the result of an action filed by Tammy Booker, now Loar (hereinafter plaintiff), against the distributor and manufacturer of a wall heater, Sears Roebuck & Company and White Rogers Division of Emerson Electric Company respectively. Also included as defendants were the propane gas wholesaler, J.D. Fite d/b/a Clayton Propane, Inc. (hereinafter wholesaler) and the gas retailer, Kiamichi Valley LP Gas Co. (hereinafter retailer); the petition contained allegations of negligence against both of these defendants. By an amended petition, plaintiff added the gas refiner, Kerr–McGee Refining Corporation (hereinafter Kerr–McGee). Prior to trial the plaintiff settled her claim with the distributor and manufacturer and dismissed all charges of negligence against the remaining defendants. After a nine day jury trial on the theory of products liability a single form verdict was returned in favor of the defendants. Six months prior to the beginning of trial the retailer and wholesaler had requested of Kerr–McGee that it take over their defense. When Kerr–McGee refused this request, the wholesaler and retailer filed cross-actions for indemnification against Kerr–McGee for any amounts the wholesaler and retailer were required to pay the plaintiff as a result of a judgment in favor of the plaintiff. After the verdict was returned motions to assess costs and attorneys' fees against the plaintiff were filed pursuant to 12 O.S.1981 § 940. The trial court denied the cross-petitions for indemnification and the motions for assessment of legal fees. The motions to tax costs against the plaintiff were granted. The wholesaler and retailer then perfected this appeal on the denial of the cross-petitions for indemnification.

## I.

## INDEMNIFICATION LAW IN OKLAHOMA

Despite the favorable verdict and lack of a written indemnification agreement, the wholesaler and retailer now contend that Kerr–McGee should be required to indemnify them for their defense costs and attorney fees under (1) the theory of an implied indemnification contract or, in the alternative, (2) the theory that only vicarious liability could attach to them as a result of an unfavorable jury verdict in this products liability suit and this would require indemnification of all costs and judgments; the lack of such unfavorable determination should not now bar their recovery of legal costs. Thus, the question presented to us is whether a manufacturer should be required to indemnify its retailer and/or wholesaler for attorney fees and costs when the jury verdict specifically found no product defect or negligence on the part of either the manufacturer, the retailer or the wholesaler.

Oklahoma has adopted the principle known as "the American rule" which holds that all parties should bear the costs of their own individual legal representation. *City Nat. Bank & Trust Co. v. Owens,* 565 P.2d 4 (Okla.1977). Exceptions to this rule have been recognized by courts where an opponent has acted in bad faith; where a litigant has conferred a substantial benefit upon a class of person; or where a "private attorney general" rationale has been found to warrant fee shifting. The theory of fee shifting, however, is based on equitable considerations and the court's power to award attorney fees despite the fact that such an award is not authorized by statute or contract. *Owens, supra.*

 Oklahoma has previously recognized that a manufacturer may be found to have a duty to indemnify its dealer against claims for loss caused by the manufacturer's defective product. *Braden v. Hendricks,* 695 P.2d 1343 (Okla.1985). Reasonable attorney fees have been allowed, as a part of damages, to an indemnitee so long as the fees were incurred in defense of the

claim indemnified against. *United General Ins. v. Crane Carrier Co.,* 695 P.2d 1334 (Okla.1984). While this duty of the manufacturer to the indemnitee is typically the result of the manufacturer being found liable the duty may be implied by operation of law and is just as enforceable as if an express indemnification agreement had been entered into by the parties. *Berry v. Barbour,* 279 P.2d 335 (Okla.1955) However, indemnification of legal costs is not permissible where an adverse position has been taken by the claimant against the party from whom indemnity is sought. This is due to the necessity of a benefit being conferred on the indemnitor before the law will impose an obligation. *Berry, supra.*

## II.

### THE RETAILER V. KERR–MCGEE, THE MANUFACTURER

■ The case before us presents facts wherein Kerr–McGee, the wholesaler and retailer handled their own defenses independently of each other and primarily each for its own benefit. The independent nature of the conduct of the defenses is particularly significant in light of the fact that during the trial counsel for the retailer stated that he disagreed very little with the plaintiff's position, cross-examined witnesses in a manner hostile to and against the interests of Kerr–McGee and even went so far as to argue for a verdict in favor of the plaintiff and discuss the amount of money necessary to compensate the plaintiff. An example of this antagonistic approach is found in the closing argument of counsel for the retailer:

> Now, let's talk about Kerr McGee Corporation, or Refining Corporation. Their attitude? "We don't have control over it. We're not part of the gas industry. We don't know where it goes."
>
> Well, it goes somewhere. Somebody uses it. Individually, people that work for Kerr McGee Refining Corporation seem like nice people, but they have a problem. The problem is, they work for a corporate ostrich that wants to bury its head in the sand and not look—not take responsibility for what it's doing.

> . . . .
>
> Let's talk a little bit about punitive damages, now. Exemplary damages, they're also called. Instruction Number 24 when you get it—You've been read it already, but you'll see it. It says, "If you find in favor of the Plaintiff and award actual damages, and if you find that the conduct of the Kerr McGee Refining Corporation is conduct that has amounted to reckless disregard for the public safety, then and in addition to the actual damages"—in addition to meaning on top of—meaning you have to have some actual damages, and you can grant the Plaintiff these exemplary damages. The range there goes from zero to a million dollars. You're the Jury. You decide what fits in those ranges, but in order to get punitive, you've got to have some actual, according to this Instruction.
>
> Now punitive damages means just what they say. Punitive means to punish. Right in that instruction it says, "Exemplary damages in a sum you reasonably believe will punish Kerr McGee Refining Corporation and be an example to others." You can find up to a million dollars in that category.
>
> Remember, the Instructions say you have to find actual damages to get the punitive. They don't say how much.
>
> How much is a life worth? You heard Mr. Branam ask you that. How much is a mixing tank worth compared to one life? How much is a sampling technique worth? How much is a specific gravity tester, or even an expensive gas chromatograph worth if it prevents one life from being lost?

The adverse position taken by the retailer and the fact that no possible benefit could be forthcoming from the retailer's attack on Kerr–McGee at trial clearly precludes the retailer from consideration for an award of legal costs.

## III.

### THE WHOLESALER V. KERR–MCGEE, THE MANUFACTURER

■ On the other hand the position of the wholesaler is distinguishable from that

of the retailer in that the wholesaler did not, at any time, attack Kerr–McGee's position. Rather, the wholesaler's case complemented that of Kerr–McGee. In finding whether this conduct warrants the granting of legal costs we must determine if an exception to the American rule is present.

A review of the arguments and testimony presented by the wholesaler throughout the trial brings the request for attorney fees under an exception to the American rule. While the retailer "jumped ship" and began attacking Kerr–McGee, the wholesaler consistently defended not only its own actions but those of Kerr–McGee. Counsel for the wholesaler was continually placed in the position of immediately following the cross-examination and opening/closing statements of counsel for the retailer. The adverse positions taken by the retailer were always quickly defused by the statements of counsel for the wholesaler in a firm but professional manner. Some of the bolstering statements of the wholesaler's counsel can be found in this excerpt from the closing argument:

> The simple fact of the matter is—is that the propane sold by Kerr McGee is as safe as they can make it. Nobody's come up with a way to prepare for what people will do. I am sure if there was a way, a safer way, you'd have heard testimony from that witness saying, "Well, they ought to do what Phillips is doing because Phillips has this new system that's a lot safer." Or, "Well, there's a place in Canada that sure has a lot better way of doing it."
>
> . . . .
>
> Ladies and Gentlemen of the Jury, there's just no liability in this lawsuit, against any of these Defendants. They operate as well as anybody in the industry does. Kerr McGee does. Certainly J.D. does—going to classes every 18 years—every year for 18 years. There's just no liability there.

Considering the fact that the wholesaler and retailer were initially placed before the jury in the same position of being downstream marketers faced with a potential products liability judgment, the benefit bestowed on Kerr–McGee by the wholesaler's supportive arguments was indeed substantial. As Kerr–McGee so benefited it is only proper that legal fees incurred by the wholesaler in defense of the products liability claim be borne by Kerr–McGee. The case is therefore remanded to the trial court for the sole purpose of fixing the amount of legal fees to be assessed against Kerr–McGee.

AFFIRMED IN PART; REVERSED IN PART; REMANDED FOR A LIMITED PURPOSE.

DOOLIN, ALMA WILSON, KAUGER and SUMMERS, JJ., concur.

OPALA, V.C.J., and LAVENDER, J., concur in Parts I & II, dissent from Part III.

HARGRAVE, C.J. and SIMMS, J., dissent.

SUMMERS, Justice, concurring.

I write separately to explain in greater detail why the wholesaler, Clayton Propane, Inc. should have it's attorney's fee paid, and why the retailer, Kiamichi Valley LP Gas Co., should not. The issue before us is the extent of a manufacturer's obligation arising from a products liability suit to indemnify a distributor of his product. The requirement of such indemnification was recognized in *Braden v. Hendricks*, 695 P.2d 1343 (Okl.1985). Where the term "manufacturer" is used herein it is meant applicable to Kerr–McGee, the gas refiner, and where "distributor" is used it is meant applicable to Clayton Propane, Inc. and Kiamichi Valley LP Gas Co., wholesalers and retailers of the gas.

In *Travelers Insurance Company v. L.V. French Truck Service, Inc.*, 770 P.2d 551 (Okl.1988), we described the manufacturer's obligation as being noncontractual or equitable indemnity similar to common law contribution. *Id.* 770 P.2d at 555 n. 16. This duty to indemnify is in the nature of a quasi-contract[1] which is also likened to

---

1. The term "quasi-contract" has been defined as "all noncontractual obligations which are treat-

common law contribution.[2] In explaining different types of quasi-contracts Professor Corbin stated:

> "Where one is compelled to pay money to a third person, which the defendant was legally bound to pay, the defendant must reimburse the one so paying. Illustrations of this are found in the rights of contribution and indemnity in favor of a surety or of a joint tort-feasor.... The same obligation has been held to exist where one pays under compulsion money that another *ought* to have paid, even though that other was not legally liable."
> Corbin, *Quasi-contractual Obligations*, 21 Yale L.J. 533, 538–539 (1912). (Emphasis in original; footnotes omitted).

Thus, just as indemnity between joint tortfeasors may give rise to a cause of action based upon quasi-contract, the obligation of the manufacturer to his distributor is one of quasi-contract. Imposition of the quasi-contract as between tortfeasors is based upon their relative moral responsibility, and the one primarily responsible for the wrong bears the consequences. F. Woodward, *The Law of Quasi Contracts*, 406–409 (1913). We recognized a similar principle in *Fakes et al. v. Price*, 18 Okl. 413, 89 P. 1123 (1907), wherein we stated

> "It is a well-established rule that among wrongdoers the law raises no implied promise or right of contribution; the legal maxim being, 'In pari delicto potior est conditio defendentis.' This rule is subject to the exception that persons jointly liable for a wrong may have contribution where there was no wrongful

intent, or where the wrong committed was not in itself illegal." *Id.* 89 P. at 1124.

We recognized a similar exception in *Braden v. Hendricks, supra,* where we stated:

> "While Oklahoma's jurisprudence does not have a statutorily unrestricted right of contribution among joint tortfeasors, it does recognize a right of indemnity when one—who was only *constructively* liable to the injured party and was in no manner responsible for the harm—is compelled to pay damages because of the tortious act of another." *Braden v. Hendricks*, 695 P.2d at 1349.

Thus, the manufacturer's obligation arises because the distributor is constructively liable for the manufacturer's wrongful act, and the obligation is one sounding in quasi-contract.

The wholesaler and retailer argue that their attorneys' fees must be paid by the manufacturer because of 15 O.S.1981 § 427(3). That provision states:

> "An indemnity against claims or demands, or liability, expressly or in other equivalent terms, embraces the costs of defense against such claims, demands or liability incurred in good faith, and in the exercise of reasonable discretion."

Their misinterpretation of § 427 becomes apparent once the manufacturer's noncontractual indemnity obligation is understood to be quasi-contractual.

Contracts may be either express or implied. 15 O.S.1981 § 131. In an express

---

ed, for the purpose of affording a remedy, as if they were contracts". F. Woodward, *The Law of Quasi Contracts*, § 1 at 1 (1913).

**2.** The development of contribution between joint tortfeasors is distinct from the genesis of quasi-contract. The common law did not provide for contribution between joint tortfeasors. *Boyles v. Oklahoma Natural Gas Co.,* 619 P.2d 613, 617 (Okl.1980); J. Indermaur, *Principles of the Common Law,* 334 (12th ed. 1914). Five forms of quasi-contract were listed in Justinian's Institutes. B. Nicholas, *An Introduction to Roman Law,* 158–159, 227–233 (1962); A. Stephenson, *History of Roman Law,* 468–469 (1912). It is generally agreed that the foundation of modern law of quasi-contracts springs from Lord Mansfield's opinion in *Moses v. Mcferlan,* 2 Burr. 1005, 97 Eng.Rep. 676 (1760).

J. Oldham, *Reinterpretations of 18th Century Contract Theory: The View from Lord Mansfield's Trial Notes,* 76 Geo.L.J. 1949, 1963 (1988). Mansfield's often quoted language was: "[i]f the defendant be under an obligation, from the ties of natural justice, to refund; the law implies a debt, and gives this action, founded in equity of the plaintiff's case, as it were upon a contract ('quasi ex contractu,' as the Roman law expresses it)." *Id.* 76 Geo.L.J. at 1964. In the late eighteenth century a form of quasi-contractual obligation was created whereby a plaintiff could obtain contribution between co-sureties and joint contractors, "[b]ut the common law stopped short of giving the same remedy to joint tortfeasors". J. Baker, *An Introduction to English Legal History,* 312 (2d ed. 1979).

contract the terms are stated in words. 15 O.S.1981 § 132. In an implied contract its existence and terms are manifested by conduct. 15 O.S.1981 § 133. An implied contract is a contract implied in fact. *Ray F. Fischer Co. v. Loeffler–Green Supply Co.*, 289 P.2d 139 (Okl.1955). In express and implied contracts an agreement exists between the parties. *Wattie Wolfe Co. v. Superior Contractors, Inc.*, 417 P.2d 302, 308 (Okl.1966).

A quasi-contract does not arise from the parties' agreement or conduct but is an obligation implied in law. *First National Bank of Okmulgee v. Matlock et al.*, 99 Okl. 150, 226 P. 328, 331 (1924). See also, R.M. Jackson, *The History of Quasi-contract in English Law*, 129 (1936), wherein he states: "the essence of contract has thus come to be agreement, whilst the essence of quasi-contract has remained a duty imposed by law irrespective of agreement". Quasi-contracts are not, in a strict sense, contracts at all.[3] The term *quasi* has been described as "a weasel word, that sucks all the meaning of the word that follows it". *Corbin on Contracts*, § 19 (1963). The scope of the quasi-contract obligation is simply not determined by substantive principles of contract law. *Cotnam v. Wisdom*, 83 Ark. 601, 104 S.W. 164 (1907); *Sceva v. True*, 53 N.H. 627 (1873); E. Woodruff, *Cases on the Law of Quasi-Contracts*, 5–6 n. 1 (2d ed 1917).

The retailer and wholesaler claim that 15 O.S.1981, § 427(3), provides for recovery of their attorneys' fees. The reason it doesn't is that section 427 begins with the language: "In the interpretation of a *contract of indemnity* the following rules are to be applied, unless a contrary intention appears." (Emphasis added). Since "con-

tracts" in Title 15 are express or implied in fact, and since indemnity sought in the present case must arise, if at all, in quasi-contract, section 427 does not apply. As we shall develop, a manufacturer's obligation under the doctrine of quasi-contracts, apart from noncontractual indemnity, may, in certain cases, require payment of the legal fees incurred by a distributor in defending a cause of action based on products liability.

In *Braden v. Hendricks, supra*, we noted that other jurisdictions recognize a manufacturer's noncontractual obligation to indemnify its distributor upon a claim for loss stemming from the manufacturer's liability for harm caused by the manufacturer's defective product. *Id.* at 1349–1350. One of the cases we cited was *Heritage v. Pioneer Brokerage & Sales, Inc.*, 604 P.2d 1059 (Alaska 1979). In *Heritage* the court found that an indemnitee/retailer was entitled to recover full costs and attorney's fees for expenses of its *successful* defense of a products liability action from the indemnitor/manufacturer. *Id.* at 1067.

The indemnitor-indemnitee relationship as described in *Braden v. Hendricks* arises because of the relative moral responsibility between a distributor and manufacturer in placing a defective product in the stream of commerce. The absence of a defective product means the absence of that indemnitor-indemnitee relationship which arises from the existence of a defective product. However, this conclusion does not settle the issue. The manufacturer must, if the principles of quasi-contract are to be recognized, still pay his distributor's attorney's fees in certain situations.

---

**3.** See 3 W.S. Holdsworth, *A History of English Law*, 424–425 (3d ed 1923), and the discussion in P.S. Atiyah, *The Rise and Fall of Freedom of Contract*, 480–490 (1979).

Professor Keener quoted the following with approval:

"'Quasi,' so used, is exclusively a term of classification. It has been usual with English critics to identify the quasi-contracts with implied contracts, but this is an error; for implied contracts are true contracts, which quasi-contracts are not.... *Maine, Ancient Law*, 4th ed., 343–4." W. Keener, *A Selection of*

*Cases on the Law of Quasi-contracts*, 14–15 n. 2 (1893). This quote from *Ancient Law* is also cited with approval in G. Campbell, *A Compendium of Roman Law*, 136 (2d ed 1892).

Similarly, Professor Fraser has stated:

"A quasi contract is not a contract, and the substantive law of contracts is not applicable because liability is not based on an agreement between the parties. Instead, liability is based on a duty which is imposed by law." G. Fraser, *Contracts, Quasi Contracts, and Pleading*, 27 Okl.L.Rev. 440, 441 (1974).

Quasi-contracts have been defined as "legal obligations arising ... from the receipt of a benefit the retention of which is unjust, and requiring the obligor to make restitution." F. Woodward, *The Law of Quasi Contracts*, § 2 at 4 (1913). Professor Corbin stated:

> "In some instances where the plaintiff has voluntarily conferred a benefit upon the defendant without the latter's request, the defendant is obliged to reimburse the plaintiff. Such was the case in Roman law known as *negotiorum gestio*, where one managed another's affairs in the latter's absence, and to the latter's benefit." Corbin, *Quasi-contractual Obligations*, 21 Yale L.J. 533, 539 (1912).

We recognized a similar principle in *Berry v. Barbour*, 279 P.2d 335 (Okl.1955). In that case a general contractor had a contract with an owner to repair his building. During this repair work the building was damaged by fire while the owner was out of the country and no one was authorized to act in his behalf. The contractor repaired the damage caused by the fire. The cause of the fire was disputed. We agreed with the contractor's proposition that a quasi-contract arose from the facts. *Id.* at 337. The owner received a benefit in the form of a repair to his building without payment therefor and the retention of this benefit [4] without compensation to the contractor was unjust.

Authority explaining "benefit" in quasi-contract law is plentiful. *See*, T. Sullivan, *The Concept of Benefit in the Law of Quasi-contract*, 64 Geo.L.J. 1, 4–13 (1975), and the cases cited therein. This author argues that the concept of a benefit has in recent times developed a broader definition to include when a party saves the other party from an expense. *Id.* 64 Geo.L.J. at

10. Professor Woodward has stated that: "[t]he benefit to the defendant is not less real because it consists of a saving of expenditure rather than an addition to his estate". F. Woodward, *The Law of Quasi Contracts*, § 247 at 391 (1913). We have recognized the same principle in defining the term "unjust enrichment".[5]

> " 'Unjust enrichment arises not only where an expenditure by one person adds to the property of another, but also where the expenditure saves the other from expense or loss.' " *McBride et al. v. Bridges*, 202 Okl. 508, 215 P.2d 830, 832 (1950).

In *Braden v. Hendricks, supra,* we held that a successful defense of the manufacturing process by a manufacturer would bar a subsequent suit against his distributor based on an identical claim. *Id.* 695 P.2d at 1352. Similarly, a successful defense of the manufacturing process by the distributor would bar a subsequent suit against the manufacturer. Thus, a distributor's successful defense protects his manufacturer from subsequent suit by the unsuccessful plaintiff, and the distributor suffers a detriment in the form of costs and attorney's fees. A distributor's successful defense of a claim for which the manufacturer would be ultimately liable but for said successful defense, saves the manufacturer an expense and confers a benefit upon him.

In a strict sense, a distributor is liable for placing a defective product into the stream of commerce apart from any liability of a manufacturer. *Braden v. Hendricks, supra,* at 1349–1350. However, a distributor's liability is vicarious when "a defect is said to be attributable solely to

---

4. Professor Fraser has commented with respect to Oklahoma quantum meruit cases "Unfortunately, in a few Oklahoma cases, it is not clear whether recovery is based on the value of plaintiff's services or the benefit to the defendant". G. Fraser, *Contracts, Quasi Contracts, and Pleading*, 27 Okl.L.Rev. 440, 441 (1974). One author has stated that "the enrichment of the receiver of value informs the analysis only insofar as it goes to show that the detriment suffered by the giver was unjust". *Corbin on Contracts*, § 19A (Supp.1989).

5. One author has stated that the terms "contract implied in law," "quasi-contract," "unjust enrichment," and "quantum meruit" are closely related but analytically separate terms. *Corbin on Contracts*, § 19 (Supp.1989). This court has stated that a duty arising from quasi-contract "is not infrequently founded on the doctrine of unjust enrichment". *Conkling's Estate v. Champlin*, 193 Okl. 79, 141 P.2d 569, 570 (1943).

the manufacturing process rather than to some conduct in the distribution system". *Id.* at 1351. In such a case the distributor is defending allegations that he (the distributor) is constructively liable for the wrongful conduct of the manufacturer. Thus, the distributor is defending a suit in the interests of the manufacturer so that the manufacturer will not be ultimately liable and the distributor thereby confers a benefit to the manufacturer by saving the manufacturer the costs of litigation. It is reasonable that a manufacturer should pay for the legal fees which save him from liability. Acceptance of a benefit requires acceptance of the attendant liability. J.H. Munkman, *The Law of Quasi-contracts*, 77 (1950).

In *Heritage, supra,* the Alaska court said:

> "If the right to costs and attorney's fees for defending the law suit is made contingent on losing on the merits of that action, in every case the indemnitee would be put in the difficult position of attempting to show lack of his own culpability at the same time that he is aiding the plaintiff's case by attempting to prove the liability of his indemnitor" *Id.* 604 P.2d at 1067.

Such a result would not inspire confidence in our adversarial judicial system. Another court in following the *Heritage* rationale has stated that a rule that allows recovery of attorney's fees only if the indemnitee loses would "penalize a party for successfully defending the allegations against it". *Pullman Standard, Inc. v. Abex Corp.,* 693 S.W.2d 336, 338 (Tenn.1985). The baseball equivalent would reward a batter for striking out, but cost him dearly if he gets a hit. Just as such a rule would be inimical to the interests of baseball so it also runs counter to the Anglo–American adversary tradition of litigation. These concerns underscore the reasonableness of requiring a manufacturer to pay for those legal costs incurred in the defense of claims for which

it would be ultimately liable. However, this duty to pay is not unqualified.

The distributor must notify the manufacturer and give him an opportunity to defend the claim, whether fees are sought under contract, 15 O.S.1981 § 427(4), or under noncontractual indemnity, *Heritage v. Pioneer Brokerage & Sales, Inc., supra,* or under the doctrine of quasi-contracts as in the case before us.[6] The manufacturer should pay for defending only those claims against the distributor which are claims of vicarious liability based on the manufacturer's wrongful conduct. Thus, the manufacturer is not liable for the expense of defending claims of negligence on the part of the distributor.

Allocating an attorney fee to a prevailing defendant/distributor and against a prevailing defendant/manufacturer does not violate the "American Rule". In *City National Bank & Trust Co. v. Owens,* 565 P.2d 4 (Okl.1977) we discussed the American Rule and its exceptions. One of the several federal cases we relied on was *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). *Id.* 565 P.2d at 7, n. 1 and n. 3. In both *Owens* and *Hall* the courts discuss several recognized exceptions to the American Rule. In *Owens,* we said:

> "The American Rule does not however serve as an absolute bar to the awarding of attorney fees in the absence of statute or contract. Courts have from common law days recognized several exceptions to the general principle that each party should bear the costs of his or her own legal representation. Courts have long recognized that attorney fees may be awarded ... where a successful litigant has conferred a substantial benefit upon a class of person[s] and the court's shifting of the fees operates to spread the costs proportionately among the members of the benefited class." *Id.* 565 P.2d at 7.

The power to award attorneys' fees in such a case is an equitable power of the court.

---

**6.** A formal tender is not required if the manufacturer is given notice of the underlying action "particularly if the indemnitor is a party to the action and the indemnitee's claim of indemnity

is a part of that action". *Hanover Limited v. Cessna Aircraft Co.,* 758 P.2d 443, 450 (Utah App.1988). I would impose that principle on the present case.

*Hall v. Cole*, at 412 U.S. 1, 4–5, 93 S.Ct. 1943, 1945–1946. This equitable power may be used in spreading the costs of litigation apart from any bad faith of the parties.

" 'Fee shifting' is justified in these cases, not because of any 'bad faith' of the defendant but, rather, because '[t]o allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich others at the plaintiff's expense.' " *Hall v. Cole*, 412 U.S. 1, 5–6, 93 S.Ct. 1943, 1946–1947, 36 L.Ed.2d 702 (1973).

This has been referred to as the common fund doctrine, although it does not require the actual creation of a fund. *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). The Court stated that "[t]he fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on this [common fund] rationale". *Id.* 396 U.S. at 392, 90 S.Ct. at 625. (Explanation added). Although creation of a fund is not required a litigant must confer a substantial benefit to the class. *Id.* 396 U.S. at 393–394, 90 S.Ct. at 626–627. This substantial benefit need not be pecuniary in nature. *Id.* 396 U.S. at 395, 90 S.Ct. at 627. The benefit may be in the form of the *stare decisis* effect on subsequent litigation. *Id.* 396 U.S. at 393, 90 S.Ct. at 626.

In summary, the common fund doctrine allows a court to exercise a power in equity to allocate attorneys' fees when a successful litigant confers a benefit to a class. In a sense, this principle is quasi-contractual. Those individuals receiving a benefit pay for the benefit received. One author has stated that application of the common fund exception "may be characterized as quasi-contractual, in that the property obtained or secured by the services of an attorney should reasonably bear the cost of the services". 2 S. Speiser, *Attorneys' Fees*, § 11.3 at 401 (1973). Requiring a manufacturer to pay for his distributor's attorney's fees which represent time spent defending a products liability claim is nothing more than making a party pay for the services that party received.

In the present case the attorneys for Clayton Propane, Inc. and Kiamichi Valley LP Gas Co. participated in the defense of the products liability claim. Independent acts of negligence were alleged against them but were dropped by plaintiff prior to trial. The only cause of action that went to trial was based on strict products liability.

The majority correctly points out that the position advocated at trial by counsel for Kiamichi Valley LP Gas Co. was contrary to Kerr–McGee's interests. Kerr–McGee's position at trial with respect to Kiamichi Valley was not one of closing ranks and uniting to defend against a common foe. Kerr–McGee rather raised as a defense at trial the actions of Tommy Ayers, the operator of Kiamichi Valley. Kerr–McGee understandably does not want to pay for the expenses of Kiamichi Valley's defense of a products liability claim (even though it could have resulted in liability for Kerr–McGee) because counsel for Kiamichi Valley in effect sided with the plaintiff at trial.

When a defendant/distributor argues the plaintiff's case against the manufacturer, as in the case of Kiamichi Valley, quasi-contract will not provide a remedy for the recovery of attorney's fees. In advocating the plaintiff's case such distributor is not attempting to confer a benefit on the manufacturer, but rather attempting to make sure that the manufacturer is liable. Our concern with a rule that rewards a party for losing the case is not present with Kiamichi Valley.

Clayton Propane, on the other hand, defended the suit in harmony with counsel for Kerr–McGee from opening statement through closing argument, calling for and participating in the defeat of plaintiff's claims. Clayton Propane, if denied an attorney's fee, would be clearly in the switch of being punished for victory and rewarded for defeat. Thus, I agree that Clayton propane should be reimbursed for its legal fees defending that portion of the plaintiff's suit concerning products liability claims, but that Kiamichi Valley may not so

recover. I therefore concur in the court's opinion.

I am authorized to state that Justice DOOLIN joins in these views.

OPALA, Vice Chief Justice, with whom LAVENDER, Justice, joins, dissenting from part III of the court's opinion.

Three products liability defendants— Kerr–McGee Refining Corporation [Manufacturer], J.D. Fite, d/b/a Clayton Propane, Inc. [Wholesaler], and Kiamichi Valley LP Gas Co. [Retailer]—came to be exonerated by verdict in a *wrongful death* action. The latter two [claimants] appeal from an adverse postjudgment disposition of their ancillary claim against Manufacturer for counsel fees and other litigation expenses incurred when defending the lawsuit.[1]

## I.

## TODAY'S HOLDING BY THE COURT

The court pronounces a *new exception* to the American Rule: when, in a products liability contest, the manufacturer and its co-defendant "marketers" (wholesalers, distributors or retailers) are exonerated by verdict, marketers may recover from the manufacturer attorney's fees and other

suit expenses, *if* their own defense efforts conferred a substantial benefit upon the manufacturer. *Never before has the legal system of this state recognized such fee-shifting claims among exonerated tort defendants.*[2] Today's pronouncement raises an implied-in-law manufacturer's promise in favor of an exonerated marketer to indemnify the latter for defense-related expenditures. In short, the opinion *transforms* the manufacturer's current status *vis-a-vis* its product distributors, immediate and remote, *from one of an indemnitor from loss to that more akin to an of indemnitor against liability.*

Although I join in giving birth to manufacturer's liability for the marketer's exoneration-related defense expenses, I would confine the new claim's actionability, at least for now, to death cases; I would today impose upon the manufacturer a duty to provide marketers, on request, with legal defense services, to be afforded either by common or separate representation, as strategy choices may dictate; I would also prescribe distinctly different parameters of liability for exonerated marketers' *self-procured* legal services where (a) the manufacturer's tendered representation was rejected and (b) the manufacturer refused to provide *any* defense services.[3]

---

1. The action was tried on products liability theory *alone*. Allegations of negligence and breach of warranty, initially advanced against the claimants as well as Manufacturer, were later voluntarily dismissed. A substantial part of the litigation expenses incurred by the claimants may have been attributable to *defending certain independent claims pressed solely against them.* Those expenses are clearly *beyond* the ambit of Manufacturer's liability for indemnity, since they are utterly unrelated to its legal accountability for the product's safety.

2. *The duty to indemnify a vicariously liable prevailing party for exoneration-related litigation expenses was unknown to the common law in the context of a master/servant status-based relation.* See the authorities cited *infra* note 15.

3. In other jurisdictions, when the manufacturer and its co-defendant-marketers all have been exonerated from liability for the product's harm, courts have held the manufacturer liable for its co-defendants' counsel fees upon various grounds. See, e.g., *Heritage v. Pioneer Brokerage & Sales, Inc.,* 604 P.2d 1059, 1067 (Alaska

1979) (manufacturer, who had a *duty to defend* its marketers, refused to take over the product's defense; retailer's "right to indemnity" was held controlling); *Boudreau v. General Elec. Co.,* 2 Haw.App. 10, 625 P.2d 384, 386 (1981) (the court's syllabus ¶ 9) (manufacturer, who had ignored the seller's tender of defense service, was held liable based on "general law" for litigation expenses incurred by exonerated seller); *Pullman Standard v. Abex Corp.,* 693 S.W.2d 336, 338–339 (Tenn.1985) (indemnitor/indemnitee *relationship* provides the basis for the manufacturer's liability under a court-created exception to the American Rule); *Hanover Ltd. v. Cessna Aircraft Co.,* 758 P.2d 443, 447 and 450 (Utah App.1988) (recovery allowed only if 1) the manufacturer's product is defective, 2) the marketer committed no wrong *vis-a-vis* the flawed product and 3) the manufacturer had notice of the indemnity claim).

Other courts have held that because marketers *would have been* entitled to indemnification for any *judgment* against them, they may recover against the manufacturer litigation expenses incurred in successfully defending the product-re-

Moreover, I would not, as the court does today, allow the new rule of liability to have a fully retrospective sweep, *but would restrict its teachings to this case, cases currently in trial or appellate process, and to all future claims arising after the pronouncement's effective date.*[4] To the additional duty I would create today—one which would require manufacturers to provide defense services on request—I would give a *purely prospective* effect and apply it *only* to claims arising after the issuance of mandate in this appeal.[5]

In part III of its opinion, the court concludes that because *Wholesaler's* defense efforts benefited Manufacturer, Wholesaler should be allowed to recover. *I would deny that claim.* In my view, this marketer did not bring itself within the purview of today's new exception to the American Rule because its contribution, made by way of *self-procured* legal services, was *not* shown to be *significant, unique* and *essential;* Wholesaler merely reinforced Manufacturer's position by aligning itself with the mainstream of common defense efforts.

Lastly, I concur in that part of today's judgment that denies *Retailer's* claim; as for the court's disposition of Wholesaler's demand, I join the opinion *only insofar as* it ushers in a *new* indemnity claim for an exonerated marketer's recovery from the manufacturer of the expenses incurred for *self-procured* legal defense services shown to have been *significant, essential* and *unique.*

## II.

## THE PRESENT STATE OF THE AMERICAN RULE AND THE NEED FOR INCORPORATION OF ESSENTIAL SAFEGUARDS INTO THE NEW EXCEPTION CREATED BY TODAY'S PRONOUNCEMENT

The American Rule, which obtains in Oklahoma,[6] makes each party responsible for its own counsel-fee expense in the absence of a contrary statute or contract. Although this State does recognize at least two equitable exceptions,[7] neither of the exoneration-related indemnity claims be-

---

lated claim. See, e.g., *Pender v. Skillcraft Industries, Inc.,* 358 So.2d 45, 47 (Fla.App. 4 Dist. 1978); *JKT Co., Inc. v. Hardwick,* 284 S.C. 10, 325 S.E.2d 329, 333 (App.1984); *Piedmont Equipment Co., Inc. v. Eberhard Mfg.,* 99 Nev. 523, 665 P.2d 256, 260 (1983). Accord: *Maple Chair Co. v. W.S. Badcock Corp.,* 385 So.2d 1036, 1038 (Fla.App. 1 Dist.1980), where the court knew of *no equitable basis* for exonerated retailer's counsel-fee award against the manufacturer when the product's alleged defect stands uncondemned by verdict.
See also generally, Annot.: Attorneys' Fees in Products Liability Suits, 53 A.L.R.4th 414.

**4.** See *Schepp v. Hess,* Okl., 770 P.2d 34, 38–39 (1989). Were I writing on a clean slate, I would follow my dissent in *Qualls v. Farmers Ins. Co., Inc.,* Okl., 629 P.2d 1258, 1259–1260 (1981), and give *purely prospective* effect to today's extension of the American Rule, applying it only to *claims arising after mandate.* In *Qualls,* the court gave retrospective application to a statute authorizing recovery of counsel fees. Since I am bound by *Qualls,* I would adopt here the prospectivity standard most consistent with my own notions of fairness. See *Schepp v. Hess, supra;* see also, *Chandler v. Denton,* Okl., 741 P.2d 855, 864 n. 21 (1987), where, writing for the court, I was called upon to follow precedent settled by an opinion from which I had dissented.

**5.** See *Harry R. Carlile Trust v. Cotton Petroleum,* Okl., 732 P.2d 438, 446 (1987).

**6.** See *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 1624, 44 L.Ed.2d 141 (1975); *Moses.v. Hoebel,* Okl., 646 P.2d 601, 603 (1982).

**7.** See *City National Bank & Trust Co. v. Owens,* Okl., 565 P.2d 4, 7–9 (1977) (costs, including attorney's fees, may be assessed against a party for litigation misconduct which causes another to incur counsel fees needlessly); *State ex rel. Burk v. City of Oklahoma City,* Okl., 598 P.2d 659, 660 (1979) (when, through litigation, a lawyer successfully preserves or creates a fund which benefits a class, counsel fees may be awarded and paid from the fund; a fee request invoking the "equitable or trust fund doctrine" is analogous to a *quantum meruit* action). The equitable fund doctrine is especially applicable in a stockholders' derivative suit. See *Warren v. Century Bankcorporation, Inc.,* Okl., 741 P.2d 846, 853 (1987) (shareholders who successfully sue in behalf of the corporation and thereby enrich that entity are entitled to recover reasonable litigation expenses, including attorney's fees, from either corporate assets or funds within the court's control).

fore us today comes within the purview of either exception.[8]

Under the theory of products liability, the seller of a defective product is liable to the buyer for injury or death occasioned by the product's unreasonable harm-dealing flaw.[9] If the plaintiff prevails and the seller becomes a judgment-debtor who pays compensation, the seller is given a nonconventional indemnity claim against the manufacturer—the entity responsible for the defect's presence.[10] Although some cases refer to the seller's (or marketer's) demand as one in "implied indemnity," the correct legal theory that underpins this kind of claim is an *implied-in-law* promise [11] (of the manufacturer) to hold the seller harmless from *loss* occasioned by the product's actionable defects.[12] The manufacturer's duty to indemnify a marketer's loss clearly is founded on *quasi contract*.[13] When indemnity is so sought for the amount of plaintiff's *loss*, attorney's fees incurred in the course of a *vanquished* marketer's defense become a legitimately includable *recovery item*.[14]

A manufacturer's vicarious accountability to a marketer, whenever triggered by

**8.** The concurring opinion cites *Mills v. Electric Auto–Lite Company*, 396 U.S. 375, 393–394, 90 S.Ct. 616, 625–627, 24 L.Ed.2d 593 (1970), for its conclusion that Wholesaler's indemnity claim against Manufacturer fits within the "equitable fund" exception of the American Rule. In *Mills*, shareholders prevailed in an action under § 14(a) of the Securities Exchange Act of 1934 *to set aside a corporate merger* accomplished by the use of a misleading proxy statement. On the question whether counsel fees were recoverable under the American Rule's common or equitable fund exception, the Court stated the doctrine could be invoked even though its claimed beneficiary did not actually create a monetary fund.

*Mills* carves out an exception to the American Rule which appears to go beyond the parameters of the traditional common fund doctrine. Oklahoma case law has not recognized this prong. Moreover, *Mills* is distinguishable from this case. Unlike in *Mills*, Wholesaler's exoneration *neither created nor preserved for Manufacturer's use any identifiable corporate fund.*

**9.** *Braden v. Hendricks*, Okl., 695 P.2d 1343, 1351–1352 (1985).

**10.** *Braden v. Hendricks, supra* note 9 at 1349–1350.

**11.** At common law, a person's vicarious liability for a sustained loss that was occasioned by the harmful conduct of another gives rise to an implied-in-law (non-contractual) indemnity claim against the responsible actor. See *Travelers Ins. v. L.V. French Tr. Serv.*, Okl., 770 P.2d 551, 555 n. 16 (1988).

**12.** A marketer's right of indemnity against a manufacturer is one for *loss* rather than *liability*. See *Porter v. Norton–Stuart Pontiac–Cadillac of Enid*, Okl., 405 P.2d 109, 111 (1965) (one who had been held *constructively* liable as an employer recovered indemnity from the *actual* employer for compensation paid to a third person injured because of the employee's negligence). A claim for indemnity from *loss* accrues *once* *payment* is made for the injury, while an action for indemnity from *liability* will lie as soon as the occasion for which indemnity is due has arisen. *Travelers Ins. v. L.V. French Tr. Serv., supra* note 11 at 555–556.

**13.** A quasi contract, a constructive contract, or an implied-in-law contract is not to be confused with an implied contract. The latter is created by the parties' conduct showing a mutual intent to form a contract—one that is *implied by the facts*. A quasi contract is one *implied in law, regardless of a party's intent. A legal obligation is thus created by means of an involuntary promise;* in the latter instance, by operation of law. *First Nat. Bank v. Matlock*, 99 Okl. 150, 226 P. 328, 331–332 (1924); *T & S Inv. Co. v. Coury*, Okl., 593 P.2d 503, 504–505 (1979).

See also, Burdick, *The Principles of Roman Law and Their Relation to Modern Law* (1938) at 475, where a quasi contract is described as follows: "In our own law 'quasi contracts' have often been confused with implied contracts, due to the fact that where the procedure of the Common Law prevails, the fiction of a promise, where none in fact exists, permits the favorite remedy of implied assumpsit. This is illustrated in cases brought to recover money paid by mistake, or obtained by fraud, likewise in cases where necessaries have been furnished an insane person, or a neglected wife or child. *'In all these cases no true contract exists. They are by many authors termed quasi contracts, a term borrowed from the Civil Law.' A quasi contract is no contract or promise at all. It is an obligation which the law creates in the absence of any agreement. 'Duty, and not a promise or agreement or intention of the person sought to be charged, defines it.'"* (citations omitted and emphasis added)

**14.** *United General Ins. v. Crane Carrier Co.*, Okl., 695 P.2d 1334, 1339 (1984); see, e.g., *Griffin v. Bredouw*, Okl., 420 P.2d 546, 549 (1966), *where it was held that the American Rule does not inhibit recovery of attorney's fees sought as but one item among multiple elements of damage*

verdict condemning the product, is analogous to the common-law liability of a servant to his master for compensation paid by the latter to a third person who was injured by the servant's negligence.[15] *If, in an action based solely on respondeat superior, the servant prevails, he bears no common-law liability, in quasi contract or otherwise, for the exonerated master's legal expenses.*[16]

Today's *new* exception to our present-day version of the American Rule goes beyond the common-law sweep of implied-in-law *loss-related* responsibility to pay for legal expenses incurred and harm dealt by a defective product. For the first time in our jurisprudence, *exoneration,* much like yesteryear's *loss,* becomes the triggering device for a quasi-contractual promise to indemnify. In my view, a manufacturer's liability for the marketer's *self-procured legal service* must not be founded upon the latter's solely duplicative defense effort advanced side-by-side with that of the manufacturer. Rather, the marketer's quasi-contractual claim to such indemnity should be founded on a *significant, essential* and *unique* contribution toward the product's exoneration.

Counsel-fee claims by exonerated marketers against prevailing manufacturers should not be recognized, at least for now, except in wrongful death actions. To ex-

tend the new indemnity farther would contravene the American Rule's *legislative* modification to be found in 23 O.S.Supp. 1986 § 103.[17] By the terms of § 103 the prevailing party in an action either to vindicate personal rights or for damages for personal injury *may now recover* up to $10,000.00 in litigation expenses *against a vanquished opponent* found to have asserted "a claim or defense in bad faith or upon insufficient legal or factual grounds." Because *wrongful death claims* —such as the very suit in the aftermath of which the instant indemnity demands arose—*are explicitly excluded from the § 103 fee-shifting regime,* I would restrict the new exception's application to wrongful death/products liability cases.

Concurrently with the fashioning of today's new exoneration-related indemnity claim, the court *should* also impose a *new duty* upon the manufacturer to provide the marketer, on request, with separate or joint representation, as strategy choices may dictate. I would today declare that the following duties shall govern in the interaction of marketers with the manufacturer for coordination of their common defense of the product:

1) If the manufacturer provides legal services on request, there should be no post-exoneration indemnity claim for counsel-fee recovery.

flowing from the same transaction or occurrence that precipitated the action.

**15.** See *Stulginski v. Cizauskas,* 125 Conn. 293, 5 A.2d 10, 11–12 (1939); *Porter v. Norton–Stuart Pontiac–Cadillac of Enid, supra* note 12 at 115 (in the master/servant context the question whether indemnitee had the right to recover litigation expenses from indemnitor was not there tendered for review); Annot. Servant's liability to master for negligent or other wrongful injury to person or property of master or of third person for which master is responsible, 110 A.L.R. 831. Cf. *Missouri, Kansas & Texas Ry. Co. v. Stanley,* Okl., 372 P.2d 852, 857 (1962) (in an action predicated solely on respondeat superior a verdict favoring the servant *exonerates the master from all liability* ); *United States v. Gilman,* 347 U.S. 507, 511–513, 74 S.Ct. 695, 697–698, 98 L.Ed. 898 (1954) (absent authorizing legislation, the Court declined to allow the employer [United States] to recover indemnity from an employee after the former had been

held liable for the employee's negligence under the Federal Tort Claims Act).

**16.** See the authorities cited *supra* note 15.

**17.** The terms of 23 O.S.Supp.1986 § 103 provide:

"In any action for damages for personal injury *except injury resulting in death,* or in any action for damages to personal rights *the court shall,* subsequent to adjudication on the merits and upon motion of the prevailing party, *determine whether a claim or defense asserted in the action by a nonprevailing party was asserted in bad faith,* was *not well grounded in fact,* or was *unwarranted* by existing law or a good faith argument for the extension, modification, or reversal of existing law. Upon so finding, the court shall enter a judgment ordering such nonprevailing party to reimburse the prevailing party an amount not to exceed Ten Thousand Dollars ($10,000.00) for reasonable costs, including

2) If the manufacturer tenders representation but the marketer rejects it, the latter can recover *only for those self-procured services that provided a significant, unique and essential component of the product's defense.*

3) If the marketer requested legal services but the manufacturer refused to provide them in any form, then the marketer would be entitled to *full* indemnity for *all* self-procured defense services.

4) A marketer who, without consultation with or notice to the manufacturer, procures its own legal representation is to be denied indemnity for litigation expenses.

5) If *separate* counsel were requested but all the manufacturer would provide is *common* representation, then the exonerated marketer would be entitled to full indemnity *upon showing that common representation would have been injurious to its legitimate trial strategy.*

attorneys fees, incurred with respect to such claim or defense." (emphasis added).

**18.** *Welling v. American Roofing, Etc.*, Okl., 617 P.2d 206, 209 (1980); *Conkling's Estate v. Champlin*, 193 Okl. 79, 141 P.2d 569 (1943) (the court's syllabus ¶ 1). See also, *Rankin v. Emigh*, 218 U.S. 27, 35, 30 S.Ct. 672, 676, 54 L.Ed. 915 (1910); *Gard v. Razanskas*, 248 Iowa 1333, 85 N.W.2d 612, 614 (1957); *Holloway v. People's Water Co.*, 100 Kan. 414, 167 P. 265, 270 (1917); *National Shawmut Bank v. Fidelity Mut. Life Ins. Co.*, 318 Mass. 142, 61 N.E.2d 18, 21 (1945).

**19.** See *Welling v. American Roofing, Etc., supra* note 18 at 210, where the court held that *in the absence* of evidence that the obligation sought to be recovered was established in bad faith, contractor was entitled to prevail against homeowner in quasi contract; *Sarber v. Harris*, Okl., 368 P.2d 93, 95–96 (1962), where it was held that when a vendee advances money in part performance of an oral sales contract that is unenforceable under the Statute of Frauds, and then *refuses to proceed with the transaction* while the other party is ready and willing to fulfill his obligations, the sum advanced *cannot* be recovered *quasi ex contractu* against the vendor; *Thurlwell v. Rabbit*, 110 Okl. 285, 235 P. 923, 926 (1925), (holding that a quasi-contractual action is founded on a *promise implied-in-law* that arises when the defendant possesses funds which he, in equity and good conscience, has no right to retain.). See also in this connection,

## III.

## QUASI CONTRACT AND THE EXTENT OF THE DUTY I WOULD IMPOSE UPON MANUFACTURERS TO PROVIDE LEGAL DEFENSE SERVICES

The concept of unjust enrichment—the law's prerequisite for imposition of implied indemnity—requires that promisee receive promisor's benefits under circumstances that give rise to legal or equitable accountability.[18] Quasi contract jurisprudence *withholds* favorable treatment from a claimant who did not further the best interest of the party against whom recovery is sought.[19] For example, an implied-in-law promise will not be raised in favor of the law's familiar "officious volunteer[20] or self-serving intermeddler"[21]—i.e., one whose performance was neither beneficial nor necessary.

To the extent a marketer refuses the manufacturer's tender of defense services and *unnecessarily* hires separate counsel, the marketer becomes a self-serving in

*Roussel v. Russell*, Okl., 339 P.2d 522, 527–528 (1959); *Jones v. Goldberger*, Okl., 323 P.2d 344, 346–367 (1958); *Rogers v. Lassiter*, 196 Okl. 228, 164 P.2d 632, 633 (1945) (the court's syllabus ¶ 1).

**20.** A "volunteer" is one who introduces himself into matters which do not concern him and does something which he is neither legally nor ethically bound to do *or which is not in pursuance of the protection of another's interest. Kelly v. Tyra*, 103 Minn. 176, 114 N.W. 750, 752 (1908).

See also, Restatement of Restitution § 113 at 464 (1937), which provides:

"*A person who has performed the noncontractual duty of another* by supplying a third person with necessaries which in violation of such duty the other had failed to supply, although acting without the other's knowledge or consent, *is entitled to restitution* therefor from the other *if he acted unofficiously* and with intent to charge therefor." (emphasis added).

**21.** See *United Federal Savings & Loan Ass'n v. Johnson*, 181 Okl. 328, 73 P.2d 846 (1937) (the court's syllabus ¶ 3); *Matter of Estate of Milborn*, 122 Ill.App.3d 688, 78 Ill.Dec. 241, 244, 461 N.E.2d 1075, 1078 (1984); *Britt v. Britt*, 320 N.C. 573, 359 S.E.2d 467, 470 (1987); Restatement of Restitution § 2 at 15 (1937), which states:

termeddler rather than a quasi-contractual promisee or obligee conferring a beneficial service on the manufacturer.[22] This would be the case if the plaintiff had brought a frivolous suit.[23] The exonerated marketer should be entitled to recover its litigation expenses against the equally blameless manufacturer *only if* the marketer's self-procured defense efforts provided a *significant, essential and unique component* of the successful common defense. If no safeguards are built into today's exoneration-related extension of the American Rule, all manufacturers likely will become unconditional, open-ended obligors for counsel fees incurred by prevailing marketers indiscriminately haled into court as defendants in groundless controversies pressed by irresponsible legal counsel whose conduct makes them amenable to Rule 11 sanctions.[24]

Both claimants assert here that during pretrial discovery they had "informally" requested that Manufacturer take over the action's defense and met with rejection.

This event is utterly without any legal significance on Manufacturer's liability because at the time it took place negligence counts were still pending below against both Wholesaler and Retailer. While these were later voluntarily dismissed in advance of trial, neither marketer renewed the prior request *after* the claim stood confined to one strictly in products liability. Under these facts, Manufacturer had had no opportunity to offer—*on request*—either common or separate representation for its marketers.

I would hold that Wholesaler's right to indemnity would be securely anchored on an implied-in-law obligation *only if* that marketer could show that it had made a *significant, essential and unique contribution* to the product's defense. This it did not do. The measure of recovery, which the court today extends to Wholesaler, should be reserved—under the norms I would apply prospectively[25]—for marketers whose request for representation had been *wrongly rejected.*

---

"A person who *officiously confers a benefit* upon another is *not* entitled to restitution therefor." (emphasis added).

**22.** Quasi-contractual liability will not be applied if it clearly appears that the claimant (or would-be promisee) incurred expenses for his own benefit or advantage, and not for that of the promisor; *a party cannot of his own volition create an obligation in his favor by acting in his own interest based on a need that he created.* See *Berry v. Barbour,* Okl., 279 P.2d 335, 336 (1955); *McBride v. Bridges,* 202 Okl. 508, 215 P.2d 830, 832 (1950); *Everhart v. Miles,* 47 Md. App. 131, 422 A.2d 28, 31 (1980).

**23.** Because manufacturers may be exposed to groundless controversies pressed by irresponsible legal counsel, the manufacturer should be under *no* duty to indemnify a marketer with *products or public liability* coverage. When faced with a frivolous claim, those marketers should look for legal representation to their own insurers—*without* recourse to the manufacturer—*or* let the manufacturer assume the burden of their entire defense. In short, I would deny indemnification to *insured* marketers for self-procured defense expenses incurred without consultation with, or request for representation by, the manufacturer.

**24.** Pressing a groundless claim may subject plaintiff's counsel to Rule 11 sanctions. See *Eastway Const. Corp. v. City of New York,* 762 F.2d 243, 253–254 (2d Cir.1985). Oklahoma's counterpart of Rule 11, Fed.R.Civ.P., is found in

12 O.S.Supp.1987 § 2011, which provides in pertinent part:

"Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address and Oklahoma Bar Association identification number shall be stated. * * * The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is *well grounded in fact* and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harrass or to cause unnecessary delay or needless increase in the cost of litigation. * * * If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, *shall impose* upon the person who signed it, a represented party, or both, *an appropriate sanction,* which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee." (emphasis added)

See also, *Winters v. City of Oklahoma City,* Okl., 740 P.2d 724, 728 n. 22 (1987).

**25.** See part II of this opinion.

## IV.

## SUMMARY

I join the court in carving out a new exception to the American Rule that allows an exonerated marketer counsel-fee recovery against an equally victorious manufacturer, but I *would confine such claim's actionability*, at least for now, *to death cases* and I would apply today's teachings prospectively to this case, those currently in trial or appellate process, and to all claims arising after the pronouncement's effective date. I would be willing to join the court in transforming the manufacturer's status from that of indemnitor from loss to one more akin to indemnitor against liability,[26] if this change (a) were restricted today to wrongful death litigation, which, as a class, stands unaffected by the legislative fee-shifting regime of § 103, and (b) were not given a *fully retrospective sweep*.

The court concludes that Wholesaler's legal services conferred a substantial benefit upon Manufacturer. In my view, the advantage Manufacturer received *via* Wholesaler's defense effort was nothing more than a purely incidental benefit derived from the latter's *pro forma* alignment "on the same side of the table." I would hence deny Wholesaler's quest to be indemnified. I fully concur in today's judgment insofar as it denies *Retailer's* claim. That marketer's openly hostile trial strategy, whose pursuit simply failed to confer on Manufacturer *any* legal benefit, contributed absolutely nothing to the product's exoneration.

Lastly, I would fashion a new duty for manufacturers to provide marketers with legal defense services on request. This requirement would have a *purely prospective* effect, extending its teachings *only* to claims arising after the issuance of mandate.

SIMMS, Justice, dissenting.

I must respectfully dissent. I would deny both appellants' claims as the facts do not support any right to indemnification under established principles of indemnification law in this jurisdiction.

I am authorized to state that Chief Justice HARGRAVE joins with me in the views expressed herein.

---

26. For the distinction between indemnity from loss and that against liability, see *supra* note 12.